UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

THERESA MARIE SMITH,

                                    Plaintiff,

            - versus -

CAROLYN W. COLVIN,[1]
Acting Commissioner of Social Security,

                                    Defendant.

MEMORANDUM
AND ORDER

12-CV-5573

APPEARANCES:

        SCHWARTZAPFEL LAWYERS, P.C.
                300 Jericho Quadrangle, Suite 180
                Jericho, New York  11753
        By:     William R. Aronin
                *Attorneys for Plaintiff*

        LORETTA E. LYNCH
                United States Attorney
                Eastern District of New York
                271 Cadman Plaza East
                Brooklyn, New York 11201
        By:     Arthur Swerdloff
                *Attorneys for Defendant*

JOHN GLEESON, United States District Judge:

        Theresa Marie Smith seeks review, pursuant to 42 U.S.C. §§ 405(g) and

1383(c)(3), of the Commissioner of Social Security's denial of her application for Supplemental

Security Income ("SSI").[2]  The parties have cross-moved for judgment on the pleadings.  The

Commissioner seeks a judgment upholding her determination and Smith seeks a remand for

---

[1]        The Clerk of the Court is respectfully directed to substitute Carolyn W. Colvin, who became the
Acting Commissioner of Social Security on February 14, 2013, for Michael J. Astrue as the defendant in this action
pursuant to Federal Rule of Civil Procedure 25(d).

[2]        Smith does not seek review of the Commissioner's denial of her application for Social Security
Disability Insurance, conceding that the record contains no evidence of her disability on or before her date last
insured.  Smith Mem. in Supp. Cross-Mot. J. Pleadings 4.

further proceedings.  I heard oral argument on July 12, 2013.  For the reasons stated below, the Commissioner's decision is reversed, and the case is remanded for further proceedings.

## BACKGROUND

A.    *Procedural History*

Smith applied for SSI on January 4, 2010, claiming disability as of January 2, 1997.  R. 128-48, 174.  The Commissioner denied her application on April 22, 2010.  R. 61-62, 88-93.  Smith then requested, R. 94-95, and received a hearing before Administrative Law Judge ("ALJ") Margaret A. Donaghy on November 22, 2010, R. 103-18.  Smith, who was not represented by counsel, testified at the hearing, R. 30-52, as did vocational expert Christina Boardman, R. 52-60.[3]  On March 25, 2011 the ALJ found that Smith was not disabled within the meaning of the Social Security Act because she retained the residual functional capacity ("RFC") to perform sedentary work, which left her unable to perform her past relevant work as a cashier but able to perform jobs existing in significant numbers in the national economy.  R. 66-71.  The Appeals Council denied Smith's request for review on September 15, 2012, R. 1-3, rendering the ALJ's adverse decision the final decision of the Commissioner, *see DeChirico v. Callahan*, 134 F.3d 1177, 1179 (2d Cir. 1998).

B.    *Non-Medical Evidence: Smith's Description of Her Medical Condition*[4]

Smith was born on September 18, 1973.  R. 128.  She lives with her two children and her mother, who has custody of the children.  R. 31, 47.  She has a ninth-grade education.[5]

---

[3]    Smith's friend Robert O'Connell accompanied her to the hearing and also testified on her behalf. R. 24.

[4]    The background facts set forth herein are taken from the administrative record, which includes, *inter alia*, information Smith provided to the United States Social Security Administration in connection with her application for disability benefits and the transcript of the hearing held before the ALJ..

[5]    In her application for benefits, Smith represented that she had completed the tenth grade.  R. 179. But at the hearing, she testified that she had completed only the ninth grade.  R. 30.  She also testified that she had been attending a GED program, but had stopped attending about a month prior to the hearing due to panic attacks and depression.  R. 30-31.

R. 30.   She worked as a cashier for a number of years during the 1990s.  R. 151-52, 174; *see also* R. 32, 34.  In this role, she was required to walk for four hours and stand for four hours.  R. 175.  She was also required to write, type, or handle large objects for four hours and write, type, or handle small objects for four hours.  R. 175.  She frequently (*i.e.*, one-third to two-thirds of the workday) lifted objects weighing less than ten pounds.  R. 175.  Smith stopped working on January 2, 1997 due to the alleged onset of her disability.  R. 174.

In her application for benefits, Rodriguez indicated that she was 5'4" tall and weighed 180 pounds.  R. 173.  She claimed she was limited in her ability to work due to cervical/lumbar disc herniation, abdominal pain, migraines, and depression.  R. 129, 170.  She reported that these conditions rendered her unable to walk, stand or sit for long periods of time.  R. 174; *see also* R. 167.  She indicated that she could walk only two blocks before having to stop and rest for five to ten minutes.  R. 174; *see also* R. 167.  She also indicated that she was unable to lift or carry items weighing over ten pounds.  R. 174.  She reported that her depression affected her concentration and memory and that she suffered from fatigue as a result of difficulty sleeping.  R. 174; *see also* R. 163.

Smith reported that she was able to care for herself, including dressing, bathing, eating, and using the bathroom.  R. 163.  She also reported that she was able to perform chores around the house, but that these tasks can sometimes take up to a full day due to her back pain and need for frequent rest.  R. 164.  She reported traveling by public transportation when she goes out.  R. 165.

In her May 24, 2010 request for review of the initial denial of benefits, Smith claimed that her abdominal pain had worsened since her initial application.  R. 155.  In particular, she claimed that she had developed gastritis and lower abdominal pain.  R. 155.  She

reported that she was experiencing greater difficulty performing activities of daily living since her initial application.  R. 159.  She indicated that she had difficulty bending and that she was getting headaches.  R. 159.  She also reported that she could not take care of her personal needs all the time and needed assistance at times due to her depression.  R. 159.  She indicated that she was unable to get out of bed for the entire month of April 2010 due to her depression.  R. 159.

At the hearing on November 22, 2010, Smith testified that she worked as a cashier until the onset of her disability.  R. 34.  She stated that she had to stop working as a result of low back and neck pains, migraines, depression, and anxiety.  R. 34.  She indicated that "there's days I can't even walk, I can't put shoes on, I can't get dressed."  R. 34.  She testified that she could not always prepare a meal for herself, wash dishes, do the laundry, or perform other chores because she was unable to sit or stand for very long.  R. 47.  She also testified that she did not go grocery shopping because she was unable to walk for very long.  R. 47.  Smith's friend Robert O'Connell testified that he would go grocery shopping on Smith's behalf.  R. 47.  Smith testified that she did not have a driver's license and used public transportation, but experienced difficulties riding the train because she would develop "[b]ad feelings" and "[n]ervous feelings." R. 48.  Smith indicated that she tries her best to care for her children.  R. 47.

The ALJ asked Smith to describe a typical day.  R. 48.  Smith testified that she normally woke up around 5:00 or 6:00 AM and would try to help her children get ready for school.  R. 48.  Once the kids are at school, Smith stated that she tries to relax by reading.  R. 48.  She indicated that she sleeps a lot, and that there are periods where she "could sleep three or four days . . . and not get out of bed."  R. 49.  She testified that this occurred on a monthly basis and that she recently "didn't get out of bed for a week, didn't shower, didn't do anything."  R. 49.

With respect to her back pain and migraines, Smith testified that up until a month before the hearing, she had been seeing a doctor about once a month and had been receiving epidural injections.[6] R. 38. She stated that she had recently started seeing another doctor, who provided Percocet[7] and patches to help her manage her pain. R. 38-39. She testified that she was taking Imitrex[8] and Robaxin[9] for her migraines. R. 46. She also testified that she uses a cane on a daily basis. R. 50.

With respect to her anxiety, Smith testified that it kept her from going to crowded places because she would "feel something very bad's going to happen." R. 35. She indicated that she had been seeing a doctor for this condition for about two and a half years. R. 35. She stated that she was taking Lexapro,[10] Xanax,[11] and Adderall.[12] R. 35. Smith (with O'Connell's assistance) also testified that she had received therapy from 2007 to 2009, R. 36, as a result of an abusive relationship, R. 34, and also received substance abuse treatment during this period, R.

---

[6] Epidural "means 'around the spinal cord'" and is a type of injection used to treat back pain. *Back Pain Injections*, WEBMD, http://www.webmd.com/back-pain/guide/back-pain-injection-treatments.

[7] Percocet is a "combination medication . . . used to help relieve moderate to severe pain." It "contains a narcotic pain reliever (oxycodone) and a non-narcotic pain reliever (acetaminophen). *Percocet*, WEBMD, http://www.webmd.com/drugs/drug-7277-Percocet+Oral.aspx?drugid=7277&drugname=Percocet+Oral#uses.

[8] Imitrex "helps to relieve headache, pain, and other migraine symptoms (including nausea, vomiting, sensitivity to light/sound)." *Imitrex*, WEBMD, http://www.webmd.com/drugs/drug-11571-Imitrex+Oral.aspx?drugid=11571&drugname=Imitrex+Oral&source=1.

[9] Robaxin is used to treat muscle spasms and pain. *Robaxin*, WEBMD, http://www.webmd.com/drugs/drug-11197-Robaxin+Oral.aspx?drugid=11197&drugname=Robaxin+Oral&source=1. Smith testified that she took it to prevent migraines from forming. R. 46.

[10] Lexapro is an antidepressant that treats a variety of conditions, including depression and other mental and mood disorders. *Lexapro*, WEBMD, http://www.webmd.com/drugs/drug-63990-Lexapro+Oral.aspx?drugid=63990&drugname=Lexapro+Oral.

[11] Xanax is used to treat anxiety and panic disorders. *Xanax*, WEBMD, http://www.webmd.com/drugs/drug-9824-Xanax+Oral.aspx?drugid=9824&drugname=Xanax+Oral. O'Connell testified that Smith took the Xanax for her panic attacks. R. 35.

[12] Adderall is used to treat attention deficit hyperactivity disorder ("ADHD") and to increase concentration. *Adderall*, WEBMD, http://www.webmd.com/drugs/drug-63163-Adderall+Oral.aspx?drugid=63163&drugname=Adderall+Oral. O'Connell testified that Smith took the Adderall for concentration. R. 35.

36-37. Smith testified that she was admitted to Coney Island Hospital sometime in 2003 for her depression and that she received counseling and treatment thereafter. R. 37-38.

Smith testified that she saw her primary care doctor about once a month or more, particularly for her gastroenterological problems. R. 40. She indicated that her doctor had recently conducted an endoscopy[13] and had discovered bleeding in the stomach. R. 40. She also indicated that she had been hospitalized within the last year for the same issue. R. 40. She stated that around late 2008 she was treated for Methicillin-resistant Staphylococcus aureus ("MRSA"),[14] which included removing a cyst from her stomach. R. 41-42. Smith testified that she was taking Aciphex[15] and Ritalin[16] for her stomach. R. 46.

C.      *Medical Evidence*

1.      *Physical Evaluations and Treatment*

a.      *December 2006-February 2010: Dr. Hugo Velarde*

On February 11, 2010 Dr. Hugo Velarde completed a medical questionnaire, where he indicated that he had been treating Smith on a monthly basis since December 18, 2006. R. 430-36. Dr. Velarde did not provide a diagnosis but indicated that Smith's current symptoms were lumbar pain and numbness in her leg. R. 430. His clinical findings were that Smith suffered from lumbar muscle spasms and that straight leg raising was positive bilaterally at 30

---

[13]      An endoscopy is "a nonsurgical procedure used to examine a person's digestive tract." It involves using an endoscope, "a flexible tube with a light and camera attached to it," to examine the digestive tract. *Endoscopy*, WEBMD, http://www.webmd.com/digestive-disorders/digestive-diseases-endoscopy.

[14]      MRSA is "a bacterium that causes infections in different parts of the body." It is "tougher to treat than most strains of . . . staph – because it's resistant to some commonly used antibiotics." *MRSA*, WEBMD, http://www.webmd.com/skin-problems-and-treatments/understanding-mrsa-methicillin-resistant-staphylococcus-aureus.

[15]      Aciphex "works by decreasing the amount of acid your stomach makes" and "relieves symptoms such as heartburn, difficulty swallowing, and persistent cough." It also "helps heal acid damage to the stomach and esophagus, helps prevent ulcers, and may help prevent cancer of the esophagus." *Aciphex*, WEBMD, http://www.webmd.com/drugs/drug-17511-Aciphex+Oral.aspx?drugid=17511&drugname=Aciphex+Oral&source=1.

[16]      Ritalin is used to treat ADHD as well as narcolepsy. *Ritalin*, WEBMD, http://www.webmd.com/drugs/drug-9475-Ritalin+Oral.aspx?drugid=9475&drugname=Ritalin+Oral&source=1. Smith testified that her doctor prescribed it to prevent vomiting. R. 46.

degrees. R. 432. He indicated that Smith's back pain caused a significant abnormality in her gait. R. 433. He reported that her treatment consisted of spinal injections, Percocet, and Lexapro. R. 431. He also stated that Smith suffered from depression. R. 431.

Dr. Velarde opined that Smith could lift and carry up to one pound occasionally. R. 433. He opined that she could stand and/or walk for thirty minutes and sit for fifteen minutes per day. R. 433. He opined Smith's ability to push and/or pull to be limited. R. 434.

On March 30, 2010, in response to a request for an explanation of the limitations he indicated Smith suffered from in his February 11, 2010 report, Dr. Velarde wrote that Smith had spinal stenosis[17] with nerve compression and weakness in her right leg. R. 439. He stated that Smith could not sit or work for long periods of time. R. 439.

b.  *December 2008: Woodhull Medical and Mental Health Center*

On December 12, 2008 Smith went to the Woodhull Medical and Mental Health Center ("Woodhull") complaining of a tender lump in the left upper quadrant of her abdomen of two days' duration. R. 264-65. She was diagnosed with an abscess[18] of the abdominal wall and underwent surgical incision and drainage of the abscess. R. 268-69. A biopsy of the abscess was positive for MRSA. R. 266-67. On a January 6, 2009 follow-up visit, Smith indicated that she had completed the course of antibiotics prescribed for the MRSA. R. 267.

c.  *August 2009-February 2010: Dr. Eugene Bulkin*

On August 20, 2009 Dr. Eugene Bulkin saw Smith for an initial consultation regarding low back, right leg, and bilateral neck pain of one month's duration. R. 365-66. Smith

---

[17]    Spinal stenosis is "the narrowing of spaces in the spine (backbone) which causes pressure on the spinal cord and/or nerves." Its symptoms may include low back pain as well as pain in the legs. *Spinal Stenosis Causes, Symptoms, Treatments, Diagnosis*, WEBMD, http://www.webmd.com/back-pain/guide/spinal-stenosis.
[18]    An abdominal abscess "is a pocket of infected fluid and pus located inside the belly (abdominal cavity)." *Intra-Abdominal Abscess*, N.Y. TIMES HEALTH GUIDE, http://health.nytimes.com/health/guides/disease/intra-abdominal-abscess.

claimed that the pain was "very severe," about an eight on a scale of one to ten, and that it prevented her from conducting normal daily activities such as walking and sitting for long periods of time. R. 365. Smith reported that she was currently taking Imitrex, Wellbutrin,[19] and Robaxin. F. 365. Smith reported that she had had a cervical MRI, which revealed small disc bulges at the C4-C5 and C5-C6 levels, and a lumbosacral MRI that was within normal limits. R. 365.

Dr. Bulkin observed that Smith was mildly obese and walked with a normal gait. R. 365. Upon examining the lumbar spine, Dr. Bulkin reported that Smith had pain with forward flexion and less pain on extension. R. 365. She exhibited no focal sensory or motor deficits in her bilateral lower extremities and her reflexes were normal and symmetrical. R. 365. Internal and external rotation of the hips was positive on the right side. R. 365. Straight leg raising was negative. R. 365. Upon examining the cervical spine, Dr. Bulkin reported that it was positive for the bilateral facet loading maneuver and negative for the Spurling maneuver.[20] R. 365-66. The bilateral cervical paraspinal muscles and bilateral lumbar paraspinal muscles were tender to palpation, but worse on the right side. R. 366.

Dr. Bulkin diagnosed Smith with cervicalgia,[21] low back pain, mild degenerative disc disease of the cervical spine, and right hip enthesopathy.[22] R. 366. Although an x-ray of Smith's right hip revealed no signs of degenerative arthritis, Dr. Bulkin noted that he believed

---

[19]    Wellbutrin is "used to treat depression . . . by helping to restore the balance of certain natural chemicals (neurotransmitters) in [the] brain." *Wellbutrin*, WEBMD, http://www.webmd.com/drugs/drug-13509-Wellbutrin+Oral.aspx?drugid=13509&drugname=Wellbutrin+Oral.

[20]    The Spurling maneuver is an "evaluation for cervical nerve root impingement in which the patient extends the neck and rotates and laterally bends the head toward the symptomatic side" and "an axial compression force is then applied by the examiner through the top of the patient's head." The test is positive "when the maneuver elicits the typical radicular arm pain." *Spurling Test*, MEDILEXICON, http://www.medilexicon.com/medicaldictionary.php?t=90833.

[21]    Cervicalgia is a general term to describe neck pain.

[22]    Enthesopathy is "a disease process occurring at the site of insertion of muscle tendons and ligaments into bones or joint capsules." *Enthesopathy*, MEDILEXICON, http://www.medilexicon.com/medicaldictionary.php.

some of Smith's symptoms were "persistently coming from the hip as well as low back pain."  R.

366.  He recommended Smith begin a comprehensive physical therapy program.  R. 366.  He

prescribed Tramadol[23] to be taken when needed and Meloxicam[24] and Flexeril[25] to be taken at

night.  R. 366.

On October 12, 2009 Dr. Bulkin saw Smith for a follow-up examination.  R. 363-

64.  Smith continued to complain of severe low back pain radiating to the right lower extremities

as well as bilateral knee pain.  R. 363.  Smith reported that the pain was worse with "ambulation,

prolonged standing, bending and lifting."  R. 363.  She informed Dr. Bulkin that the medications

he prescribed were not relieving her symptoms and that physical therapy had made them worse.

R. 363.  Smith claimed that the pain was about a seven on a scale of one to ten and that it

continued to interfere with her normal daily activities.  R. 363.  Dr. Bulkin noted that a

lumbosacral MRI had revealed only mild disc bulges.  R. 363.

Upon examining the lumbar spine, Dr. Bulkin reported that Smith had pain with

forward flexion that radiated to the right posterior buttock area.  R. 363.  Internal and external

rotation of the hips was negative.  R. 363.

Dr. Bulkin conducted electromyogram ("EMG") and nerve conduction velocity

("NCV") studies.[26]  R. 363.  The studies revealed signs of L5-S1 radiculopathy.[27]  R. 363.  Dr.

---

[23]        Tramadol is used "to help relieve moderate to moderately severe pain."  *Tramadol*, WEBMD, http://www.webmd.com/drugs/mono-5239-TRAMADOL+-+ORAL.aspx?drugid=4398&drugname=Tramadol+Oral&source=0.

[24]        Meloxicam is used to treat arthritis by reducing "pain, swelling, and stiffness of the joints."  *Meloxicam*, WEBMD, http://www.webmd.com/drugs/drug-911-meloxicam+Oral.aspx?drugid=911&drugname=meloxicam+Oral&source=1.

[25]        Flexeril is "used short-term to treat muscle spasms" and "works by helping to relax the muscles."  *Flexeril*, WEBMD, http://www.webmd.com/drugs/drug-11372-Flexeril+Oral.aspx?drugid=11372&drugname=Flexeril+Oral&source=1.

[26]        An EMG study "measures the electrical activity of muscles at rest and during contraction."  An NCV study "measure[s] how well and how fast the nerves can send electrical signals."  These tests "check how well your spinal cord, nerve roots, and nerves and muscles that control your legs are working."  *Electromyogram (EMG) and Nerve Conduction Studies*, WEBMD, http://www.webmd.com/brain/electromyogram-emg-and-nerve-conduction-studies.

Bulkin recommended that Smith continue physical therapy and prescribed a Medrol Dosepak.[28] R. 364. He noted that he would consider "interventional procedures if anti[-]inflammatory oral medications do not relieve the symptoms." R. 364.

On October 13, 2009 Smith went to a physical therapy spine evaluation. R. 203-04. She subsequently attended physical therapy sessions on October 21; October 29; and November 5, 2009. R. 202, 205, 261.

On November 17, 2009 Dr. Bulkin completed a "Treating Physician's Wellness Plan Report." R. 208-09. In the report, Dr. Bulkin made the clinical findings that Smith suffered from leg pain, back pain, and degenerative disc disease. R. 208. He diagnosed Smith with lumbosacral radiculopathy, which was being treated with physical therapy, medication, and epidural steroid injection. R. 208. He estimated that Smith's condition would be resolved or stabilized by February 2010. R. 209. He opined that Smith was employable with the following limitations: no lifting more than twenty pounds, no sitting more than thirty minutes, and no bending. R. 209. He also opined that Smith would be unable to work for at least twelve months. R. 209.

On December 11, 2009 Dr. Bulkin administered an epidural steroid injection at L5-S1 on the right "[i]n order to better diagnose and treat [Smith]'s spinal pain and related symptoms." R. 361.

On December 28, 2009 Dr. Bulkin saw Smith for a follow-up examination. R. 362. Smith reported a good response to the injection but noted that the relief had subsided after a

---

[27] Radiculopathy is "a condition due to a compressed nerve in the spine that can cause pain, numbness, tingling, or weakness along the course of the nerve." It can "occur in any part of the spine, but it is most common in the lower back (lumbar radiculopathy) and in the neck (cervicular radiculopathy)." *Radiculopathy Causes, Symptoms, and Treatment*, MEDICINENET.COM, http://www.medicinenet.com/radiculopathy/article.htm#what_is_radiculopathy.

[28] Medrol is a "a steroid that prevents the release of substances in the body that cause inflammation." *Medrol, Medrol Dosepak, Methylprednisolone Dose Pack*, EMEDICINEHEALTH, http://www.emedicinehealth.com/drug-methylprednisolone/article_em.htm.

week.  R. 362.  Smith complained of bilateral thigh pain and stated that she had been taking

Endocet[29] as needed.  R. 362.  She reported that she was more mobile and claimed her pain was a

five on a scale of one to ten.  R. 362.   Dr. Bulkin noted that a lumbosacral MRI had revealed

disc herniations at the L4-5 and L5-S1 level.[30]  R. 362.

Dr. Bulkin reported that an examination of the lumbar spine was "positive" with

forward flexion, extension, and rotation.  R. 362.  Straight leg raising was positive bilaterally.  R.

362.  Internal and external rotation of the hips was negative.  R. 362.  The bilateral cervical

paraspinal muscles were tender to palpation.  R. 362.

Dr. Bulkin diagnosed Smith with lumbosacral radiculopathy and low back pain

due to a herniated lumbosacral disc.  R. 362.  He recommended Smith schedule a second

epidural steroid injection and to continue physical therapy.  R. 362.  He noted that Smith could

continue to take Endocet as needed.  R. 362.

On January 6, 2010 Dr. Bulkin administered a second epidural steroid injection at

L5-S1.  R. 489-93.

On February 2, 2010 Dr. Bulkin saw Smith for a follow-up examination.  R. 360.

Smith reported a good response to the second injection but noted that the relief was subsiding.

R. 360.  She reported most of the pain to be in the right hip and posterior hip on the right side,

which occasionally radiated to the left lower extremity behind the posterior calf.  R. 360.  She

---

[29]       Endocet is a combination medication containing "a narcotic pain reliever (oxycodone) and a non-narcotic pain reliever (acetaminophen)," which is "used to help relieve moderate to severe pain." *Endocet*, WEBMD, http://www.webmd.com/drugs/drug-15178-Endocet+Oral.aspx?drugid=15178&drugname=Endocet+Oral&source=0.

[30]       "The bones (vertebrae) that form the spine in your back are cushioned by small, spongy discs. When these discs are healthy, they act as shock absorbers for the spine and keep the spine flexible. But when a disc is damaged, it may bulge or break open. This is called a herniated disc. It may also be called a slipped or ruptured disc." *Herniated Disc – Topic Overview*, WEBMD, http://www.webmd.com/back-pain/tc/herniated-disc-topic-overview.

reported that she was taking Endocet up to three times a day on and off and that her pain was a five on a scale of one to ten. R. 360.

Dr. Bulkin reported that an examination of the lumbar spine was "positive" with extension and rotation bilaterally. R. 360. Internal and external rotation of the hips was positive on the right side. R. 360. Straight leg raising was negative bilaterally. R. 360. The right posterior hip abductors and bilateral lumbosacral paraspinal muscles were tender to palpation. R. 360.

Dr. Bulkin diagnosed Smith with lumbosacral spondylosis,[31] possible radiculopathy, and hip enthesopathy on the right side. R. 360. He recommended that Smith continue to take Endocet as needed and begin Meloxicam once a day. R. 360. He noted that he would consider "intra-articular injection of the right hip if symptoms do not improve with conservative treatment and physical therapy." R. 360.

d.    *October 2009: Arbor WeCare*

On October 9, 2009 Smith met with Dr. Jacqueline McGibbon at Arbor WeCare. R. 241-47. Smith described experiencing migraines and neck, back, and abdominal pain. R. 241. She stated that her neck and back pain impacted her ability to work. R. 241. She listed her current medications as Robaxin, Imitrex, Wellbutrin, Meloxicam, Lyrica,[32] Endocet, and Xanax. R. 241. An MRI performed on August 6, 2009 revealed disc disease, central canal stenosis at C4-C5 and C5-C6, with a mass effect on the cord at C4-C5. R. 243. Smith reported that she was

---

[31]    Spondylosis is the "stiffening or fixation of the bony building blocks of the spine (vertebrae) as a result of a disease process" and "refers to degenerative changes in the spine such as bone spurs and degenerating intervertebral discs." These changes are "frequently referred to as osteoarthritis." Lumbosacral spondylosis is spondylosis "which affects both the lumbar spine and the sacral spine (below the lumbar spine, in the midline between the buttocks." *Spondylosis*, EMEDICINEHEALTH, http://www.emedicinehealth.com/spondylosis/article_em.htm.

[32]    Lyrica is used "to treat pain caused by nerve damage due to diabetes or to shingles (herpes zoster) infection" and may also be used "to treat nerve pain caused by spinal cord injury." *Lyrica*, WEBMD, http://www.webmd.com/drugs/drug-93965-Lyrica+Oral.aspx?drugid=93965&drugname=Lyrica+Oral&source=1.

undergoing physical therapy twice a week and had an appointment for EMG testing. R. 243. She also reported that she had a sonogram pending for her abdominal pain. R. 243.

Dr. McGibbon's examination revealed tenderness of the lumbosacral spine. R. 244. Straight leg raising was positive at 45 degrees. R. 244. Smith had a limited range of motion of the right shoulder to 180 degrees. R. 244. She could internally rotate both upper extremities and had a good bilateral grasp. R. 244. She walked with a slight limp after sitting. R. 244. Smith's abdomen revealed mild epigastric tenderness. R. 244.

Dr. McGibbon diagnosed Smith with cervical and lumbar disc herniation, mild abdominal and epigastric pain, migraines, and depression. R. 245. She opined that Smith was temporarily unemployable. R. 245. She found that Smith could sit, stand, and walk for one to three hours, and could grasp objects for four to six hours. R. 246. She found that Smith could not pull, climb, bend, kneel or reach. R. 246. Her ability to lift, carry, and push were abnormal due to back and leg pain. R. 246.

e.    *November 2009: Coney Island Hospital*

Smith went to the Coney Island Hospital emergency room on November 27, 2009 with complaints of nausea, vomiting, diarrhea, and epigastric pain after eating. R. 212, 227. She was subsequently admitted to the hospital for gastroenteritis. R. 214, 218-19. A CT-scan of Smith's abdomen revealed left colonic wall thickening, possibly compatible with colitis.[33] R.

---

[33]    Colitis refers to inflammation of the colon. *Colitis*, MEDILEXICON, http://www.medilexicon.com/medicaldictionary.php?t=18854.

221.  Smith was treated for acute gastroenteritis with IV fluids, Metronidazole,[34] and

Ciprofloxacin.[35]  R. 219-20.  She was discharged on December 4, 2009.  R. 219.

        f.     *February 2010-August 2010: Dr. David Lifschutz*

On February 25, 2010 Dr. David Lifschutz, M.D. saw Smith at Integrated

Neurological Associates, PLLC ("Integrated") to evaluate injuries Smith sustained in an accident

while riding a bus on February 11, 2010.  R. 469-71.  Smith reported that she "was jolted" when

a van rear-ended the bus.  R. 469.  She complained of neck pain radiating into her right shoulder,

right shoulder pain, lower back pain radiating into the right thigh, and right knee pain with some

difficulty walking.  R. 469.  She indicated that she took Imitrex, Nexium,[36] and Ibuprofen as

needed.  R. 469.

Dr. Lifschutz's examination of Smith revealed her to be in some discomfort.  R.

470.  Smith walked with a normal gait but exhibited some difficulty with toe to heel walking.  R.

470.  She had full muscle strength in all extremities except for her right shoulder, which

exhibited "giveway weakness/pain."  R. 470.  She also exhibited normal reflexes in all

extremities with the "exception of sluggish ankle jerks."  R. 470.  An examination of the cervical

spine revealed tenderness on palpation of the "paraspinal/right trapezius muscles" and a limited

active range of motion with her right and left lateral flexion limited to 35 out of 45 degrees (or

77% of normal).  R. 470.  The Spurling maneuver was positive on the right.  R. 470.  An

examination of the lumbosacral spine revealed tenderness on palpation of the "paraspinal/gluteus

---

[34]      Metronidazole is "used to treat a variety of infections" by "stopping the growth of bacteria and protozoa."  *Metronidazole*, WEBMD, http://www.webmd.com/drugs/mono-55-METRONIDAZOLE+-+ORAL.aspx?drugid=6426&drugname=Metronidazole+Oral&source=0.
[35]      Ciprofloxacin is "used to treat a variety of bacterial infections" by "stopping the growth of bacteria."  *Ciprofloxacin*, WEBMD, http://www.webmd.com/drugs/mono-93-CIPROFLOXACIN+-+ORAL.aspx?drugid=7748&drugname=ciprofloxacin+Oral&source=1.
[36]      Nexium is used "to treat certain stomach and esophagus problems (such as acid reflux, ulcers) and "relieves symptoms such as heartburn, difficulty swallowing, and persistent cough."  *Nexium*, WEBMD, http://www.webmd.com/drugs/drug-20536-Nexium+Oral.aspx?drugid=20536&drugname=Nexium+Oral.

muscles" and a limited active range of motion with forward flexion limited to 40 out of 60 degrees (or 60% of normal). R. 470. Straight leg raising was positive at 30 degrees. R. 470. An examination of the right shoulder revealed tenderness on palpation with a limited active range of motion. R. 470. An examination of the knee also revealed tenderness on palpation. R. 470.

Dr. Lifschutz diagnosed Smith with (1) cervical strain, sprain, and myofasciitis with radicular symptoms; (2) right shoulder strain/sprain; (3) lumbosacral strain, sprain, and myofasciitis with radicular signs/symptoms; and (4) right knee strain/sprain. R. 471. He recommended (1) physical therapy and acupuncture; (2) cervical traction unit and lumbosacral orthosis; (3) Flector patch;[37] (4) Naproxen;[38] (5) Amrix;[39] (6) Percocet; (7) MRI of the right shoulder; and (8) neurology follow-up. R. 471. Smith attended 18 sessions of physical therapy at Integrated between March 1, 2010 and August 20, 2010. R. 477-483.

On March 25, 2010 Smith returned to Dr. Lifschutz for a follow-up. R. 466-468. She continued to complain of the same symptoms as her prior visit, but reported that physical therapy and acupuncture were helping. R. 466. She indicated that she was taking Imitrex, Nexium, Naproxen, and Percocet. R. 466. Dr. Lifschutz's examination of Smith revealed no changes in her condition and his diagnoses remained unchanged. R. 466-67. He recommended an MRI of the cervical and lumbar spine. R. 467. Dr. Lifschutz administered trigger point injections and placed a Flector patch over the right cervical region. R. 468.

---

[37]     Flector patches "are used to relieve pain from various conditions" and are known as "a nonsteroidal anti-inflammatory drug (NSAID)." *Flector*, WEBMD, http://www.webmd.com/drugs/drug-149654-Flector+Top.aspx?drugid=149654&drugname=Flector+Top#uses.

[38]     Naproxen is "used to relieve pain from various conditions such as headaches, muscle aches, tendonitis, dental pain, and menstrual cramps" and is an NSAID. *Naproxen*, WEBMD, http://www.webmd.com/drugs/mono-1289-NAPROXEN+-+ORAL.aspx?drugid=5173&drugname=naproxen+Oral&source=1#uses.

[39]     Amrix is "used short-term to treat muscle spasms" and "works by helping to relax the muscles." *Amrix*, WEBMD, http://www.webmd.com/drugs/drug-148753-Amrix+Oral.aspx?drugid=148753&drugname=Amrix+Oral&source=1.

On April 8, 2010 Smith returned to Dr. Lifschutz for a follow-up.  R. 464-65.  She continued to complain of the same symptoms as her prior visit in addition to occipital headaches, but reported that physical therapy and acupuncture were helping.  R. 464.  She indicated that she was taking Imitrex, Nexium, Naproxen, and Percocet.  Dr. Lifschutz's examination of Smith revealed no changes in her condition and his diagnoses remained unchanged.  R. 464-65.

On May 6, 2010 Smith returned to Dr. Lifschutz for a follow-up.  R. 461-62.  She continued to complain of the same symptoms as her prior visit, but reported that physical therapy, acupuncture, and trigger point injections were helping.  R. 461.  She indicated that she was taking Imitrex, Nexium, Naproxen, and Percocet.  R. 461.  Dr. Lifschutz's examination of Smith revealed no changes in her condition and his diagnoses remained unchanged.  R. 461-62.  He administered trigger point injections and placed a Flector patch over the right cervical region.  R. 463.  He also prescribed Fioricet[40] to help alleviate Smith's headaches.  R. 462.

On May 27, 2010 Smith underwent an MRI of her right shoulder.  R. 472.  The MRI revealed tendonitis of the distal supraspinatus tendon,[41] a physiological joint space effusion,[42] and hypertrophic changes of the acromioclavicular joint.  R. 472.  On June 3, 2010 Smith underwent an MRI of the lumbosacral spine.  R. 475-76.  The MRI revealed a central left lateral herniated disc deforming the thecal sac[43] and proximal L3 nerve root at the L2-L3 level,

---

[40]    Fioricet is a "combination medication . . . used to treat tension headaches."  It consists of acetaminophen used to decrease the pain from the headache, caffeine to increase the effects of the acetaminophen, and butalbital to help decrease anxiety and cause sleepiness and relaxation.  *Fioricet*, WEBMD, http://www.webmd.com/drugs/drug-15869-Fioricet+Oral.aspx?drugid=15869&drugname=Fioricet+Oral&source=0.

[41]    The distal supraspinatus tendon is "located at the far – or distal – end of the supraspinatus muscle, where the arm meets the shoulder."  It "links the supraspinatus muscle to the shoulder joint, allowing the muscle to perform its primary function of lifting the arm away from the side of the body" and is one of four tendons that make up the rotator cuff.  *What is the Distal Supraspinatus?*, EHOW, http://www.ehow.com/facts_5747784_distal-supraspinatus_.html.

[42]    Effusion is "[t]he escape of fluid from the blood vessels or lymphatics into the tissues or a cavity."  *Effusion*, MEDILEXICON, http://www.medilexicon.com/medicaldictionary.php?t=28077.

[43]    "[I]n the lumbar spine there is no spinal cord. Instead, the nerve roots hang like a 'horse[']s tail' in an enclosed . . . sac called the Thecal Sac."  Douglas M. Gillard, *Disc Anatomy*, CHIROGEEK.COM, http://www.chirogeek.com/000_disc_anatomy.htm.

diffuse posterior disc bulges deforming the thecal sac and bilateral L4 and L5 nerve roots at the L3-L4 and L4-L5 levels, and posterior disc bulge extending into the epidural fat abutting the bilateral S1 nerve roots at the L5-S1 level.  R. 476.

On June 10, 2010 Smith returned to Dr. Lifschutz for a follow-up.  R. 476.  She continued to complain of the same symptoms as her prior visit, but reported that physical therapy, acupuncture, and trigger point injections were helping.  R. 452.  Dr. Lifschutz noted the results of Smith's May 27, 2010 and June 4, 2010 MRIs in his report.  R. 452.  Smith indicated that she was taking Imitrex, Nexium, Naproxen, and Percocet.  R. 452.  Dr. Lifschutz's examination of Smith revealed no changes in her condition.  R. 452.  His diagnoses remained unchanged with respect to the cervical region and knee but he incorporated the MRI findings with respect to the shoulder and lumbosacral regions.  R. 453.  He administered trigger point injections and placed a Flector patch over the right cervical region.  R. 454.

On June 11, 2010 Smith underwent an MRI of her cervical spine.  R. 473-74.  The MRI revealed C4-C5 and C5-C6 diffuse posterior disc bulges deforming the thecal sac and spinal cord.  R. 474.

On June 24, 2010 Smith returned to Dr. Lifschutz for a follow-up.  R. 450-51.  She complained of neck pain radiating into her right shoulder, right shoulder pain, lower back pain radiating into the right thigh, and right knee pain with difficulty walking and intermittent buckling, but reported that physical therapy, acupuncture, and trigger point injections were helping.  R. 450.  Dr. Lifschutz noted the results of Smith's June 11, 2010 MRI in his report.  R. 450.  Smith indicated that she was taking Imitrex, Nexium, Fioricet, Naproxen, and Percocet.  R. 450.  Dr. Lifschutz's examination of Smith revealed no changes in her condition.  R. 452.  His diagnoses remained unchanged with respect to the knee, shoulder, and lumbosacral region but

incorporated the MRI findings with respect to the cervical region.  R. 451.  Dr. Lifschutz

conducted EMG and NCV studies of Smith's upper and lower extremities, which revealed

evidence of right L4-L5 radiculopathy.  R. 451, 455-60.

On July 8, 2010 Smith returned to Dr. Lifschutz for a follow-up.  R. 448-49.  She

continued to complain of the same symptoms as her prior visit, but reported that physical

therapy, acupuncture, and trigger point injections were helping.  R. 448.  Smith indicated that she

was taking Imitrex, Nexium, Fioricet, and Percocet.  R. 448.  Dr. Lifschutz's examination of

Smith revealed no changes in her condition except to note that there was no longer a limited

range of motion in Smith's right shoulder.  R. 448.  Dr. Lifschutz's diagnoses remained

essentially unchanged.  R. 449.

On August 19, 2010 Smith returned to Dr. Lifschutz for a follow-up.  R. 445-46.

She complained of the same symptoms as her prior visit in addition to occipital headaches, but

reported that physical therapy and acupuncture were helping.  R. 445.  Smith indicated that she

was taking Imitrex, Nexium, Fioricet, and Percocet.  R. 445.  Dr. Lifschutz's examination of

Smith revealed no changes in her condition except to note that forward flexion of the

lumbosacral spine was 45 degrees (75% of normal) and there was no longer tenderness in the

right shoulder.  R. 445.  Dr. Lifschutz's diagnoses remained unchanged except for the addition of

cervicogenic headaches.[44]  R. 446.  He administered trigger point injections and placed a Flector

patch over the right cervical region.  R. 447.

---

[44]    A cervicogenic headache "is a syndrome characterized by chronic hemicranial pain that is referred
to the head from either bony structures or soft tissues of the neck."  David M. Biondi, *Cervicogenic Headache: A
Review of Diagnostic and Treatment Strategies*, 105 J. AM. OSTEOPATHIC ASS'N S16, S16 (2005), *available at*
http://www.jaoa.org/content/105/4_suppl/16S.full.pdf+html (last visited July 9, 2013).

### g.     *April 2010: Dr. Louis Tranese*

On April 2, 2010 Smith underwent a consultative orthopedic examination by Dr. Louis Tranese at Industrial Medicine Associates, P.C. ("Industrial Medicine") upon referral by the New York State Office of Temporary and Disability Assistance.[45]  R. 277-80.  Smith complained of daily neck pain, radiating to the upper right extremity, of four to five months' duration, which had progressed to the lumbar region.  R. 277.  Smith also complained of daily low back pain, mostly on the right side, radiating to the right lower extremity down to the knee. R. 277.  She reported occasional numbness and tingling of the right lower extremity and burning pain in the right thigh.  R. 277.  She rated her back pain as an eight on a scale of one to ten. Smith indicated that frequent bending, lifting, long-distance ambulation, stair climbing, and standing for long periods aggravated the pain in her neck and back.  R. 277.  She also reported that repetitive upper extremity motions, particularly overhead reaching, aggravated her neck pain.  R. 277.  Smith indicated that she needed assistance with showering, dressing, and grooming, as well as with cooking, cleaning, laundry, and shopping.  R. 278.  She indicated that she takes Zoloft,[46] Alprazolam,[47] Imitrex, Allegra, Nexium, Adderall, Trazodone,[48] and Endocet. R. 278.

Upon physical examination, Dr. Tranese found Smith to be in no acute distress. R. 278.  She walked with a normal gait without any assistive device and on her heels and toes

---

[45]     This office is the state agency responsible for obtaining information in connection with Smith's application for disability benefits.

[46]     Zoloft is "used to treat depression, panic attacks, obsessive compulsive disorder, post-traumatic stress disorder, social anxiety disorder (social phobia), and a severe form of premenstrual syndrome (premenstrual dysphoric disorder)."  *Zoloft*, WEBMD, http://www.webmd.com/drugs/mono-8095-SERTRALINE+-+ORAL.aspx?drugid=35&drugname=Zoloft+Oral&source=1.

[47]     Alprazolam is "used to treat anxiety and panic disorders."  *Alprazolam*, WEBMD, http://www.webmd.com/drugs/mono-7244-ALPRAZOLAM+-+ORAL.aspx?drugid=8171&drugname=alprazolam+Oral&source=1.

[48]     Trazodone is used to treat depression.  *Trazodone*, WEBMD, http://www.webmd.com/drugs/mono-89-TRAZODONE+-+ORAL.aspx?drugid=11188&drugname=trazodone+Oral&source=1#uses.

without any difficulty.  R. 278.  She needed no assistance changing for the exam or getting on and off the exam table.  R. 278.  She rose from the chair without any difficulty.  R. 278.  Her cervical spine exhibited full flexion, extension, and bilateral rotary movements.  R. 279.  Smith reported bilateral cervical paraspinal tenderness extending into her right superior trapezial region.  R. 279.  Smith exhibited full range of motion in her shoulders, elbows, forearms, wrists, and fingers bilaterally.  R. 279.  She had full strength in her proximal and distal muscles in the upper extremities bilaterally.  R. 279.  Her bilateral upper extremity reflexes were symmetric but hyperreflexic (3+) throughout.  R. 279.  There was no joint inflammation, effusion, or instability in the upper extremities.  R. 279.

An examination of Smith's thoracic and lumbar spines revealed full flexion, extension, and bilateral rotary movements.  R. 279.  Smith reported bilateral lumbar paraspinal tenderness.  R. 279.  Straight leg raising was negative bilaterally.  R. 279.  Smith exhibited a full range of motion in her hips, knees, and ankles bilaterally.  R. 279.  She had full strength in her proximal and distal muscles in the lower extremities bilaterally.  R. 279.  Bilateral ankle jerk reflexes were absent.  R. 279.  There was no joint inflammation, effusion, or instability in the lower extremities.  R. 279.  X-rays of  Smith's cervical and lumbosacral spines were negative. R. 279, 281-82.

Dr. Tranese diagnosed Smith with chronic neck and low back pain with reported history of disk derangement to the lumbar spine and cervical pain with signs of myelopathy.[49]  R. 280.  Dr. Tranese opined that Smith had moderate limitations for heavy lifting and mild to moderate limitations with respect to frequent bending, squatting, kneeling, and crouching.  R.

---

[49]     Myelopathy is "[t]he clinical syndrome that results from a disorder in the spinal cord that disrupts or interrupts the normal transmission of the neural signals."  Cervical myelopathy "may involve the arms and hands, legs, and bowel and bladder function."  *Cervical Myelopathy*, *Columbia Neurosurgery*, COLUMBIA UNIVERSITY MEDICAL CENTER, http://www.columbianeurosurgery.org/conditions/cervical-myelopathy/.

280. He opined that Smith might have mild limitations with respect to long-distance ambulation, frequent stair climbing, and performing repetitive overhead activities using her arms. R. 280. He opined that she had no limitations using her hands for fine and gross manual activities. R. 280.

### 2. *Psychiatric Evaluations and Treatment*

#### a. *Dr. Shang Liu*

On June 24, 2009 Dr. Shang Liu saw Smith for an initial psychiatric evaluation. R. 332-41. Smith complained of depression, insomnia, hopelessness, decreased capacity for pleasure, and anxiety with episodes of panic attacks. R. 332. She reported decreased levels of concentration and energy and that she was sometimes preoccupied with feelings of guilt or worthlessness. R. 332. She also noted that she experienced difficulty sleeping. R. 332. She indicated that she was not preoccupied with thoughts of death or of placing herself in harm's way. R. 332. She exhibited no suicidal ideation or intent or psychotic symptoms. R. 333.

Smith indicated that she had undergone psychiatric hospitalization and treatment in the past. R. 332. She indicated that she had received outpatient treatment in the 1990s and went to the Coney Island Hospital emergency room in 2007 for depression and anxiety. R. 334.

Dr. Liu performed a mental status examination and found Smith to be cooperative. R. 337. Smith exhibited normal psychomotor activity, spoke at a normal rate and rhythm, and made good eye contact. R. 337. She had a fair ability to express thoughts and to comprehend spoken language. R. 337. Her attention was distractible. R. 337. Dr. Liu found Smith's mood to be depressed and anxious. R. 338. Smith's thought process was goal-directed and her thought content evidenced no disturbance. R. 338. She exhibited no perceptual disturbances. R. 338. Her insight, judgment, and impulse control were fair. R. 338.

Dr. Liu diagnosed Smith with major depressive disorder and generalized anxiety disorder on Axis I.[50]  R. 340.  He gave Smith a GAF score of 55-60.[51]  R. 341.  He recommended individual psychotherapy, R. 339, and prescribed Wellbutrin, Adderall, and Xanax, R. 342.

On July 22, 2009 Dr. Liu saw Smith, who complained of poor concentration and requested an increase in the dosage of her Adderall.  R. 345.  Dr. Liu increased Smith's Adderall dosage from 20 to 30 milligrams.  R. 342.

Dr. Liu saw Smith on August 19, 2009 and September 18, 2009.  R. 346-47.  Dr. Liu's examinations revealed no changes in her condition, R. 346-47, and he maintained Smith's prescriptions at the same dosages.  R. 342.

Dr. Liu saw Smith on October 14, 2009 and November 12, 2009.  R. 348-49.  Smith reported feeling better and indicated that the Adderall had enhanced her concentration.  R. 348-49.  Dr. Liu's examinations revealed no changes in her condition, R. 348-49, and he maintained Smith's prescriptions at the same dosages.  R. 342.

Dr. Liu saw Smith on December 9, 2009; January 6, 2010; February 3, 2010; March 3, 2010; and March 31, 2010.  R. 350-54.  Dr. Liu's examinations revealed no changes in her condition, R. 350-54, and he maintained Smith's prescriptions at the same dosages.  R. 342-43.

Dr. Liu saw Smith on May 26, 2010.  R. 355.  Smith reported feeling anxious and discussed her gastrointestinal issues with Dr. Liu.  R. 355.  Dr. Liu's examination revealed no

---

[50]     The Diagnostic and Statistical Manual of Mental Disorders ("DSM") classifies mental disorders according to five axes.  Axis I refers to clinical disorders and other conditions that need clinical attention.  Axis II refers to personality disorders and mental retardation.  Axis III refers to general medical conditions.  Axis IV refers to psychosocial and environmental problems.  Axis V refers to an individual's Global Assessment of Functioning Scale ("GAF").  The GAF scale reflects a patient's level of psychological, social, and occupational functioning and ranges from 1 to 100.  American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* ("DSM-IV-TR") 27-34 (4th edition – text revision 2000).

[51]     A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *Id.*

changes in her condition, R. 355, and he maintained Smith's prescriptions at the same dosages, R. 343.

Dr. Liu saw Smith on June 22, 2010. R. 356. Smith reported that she was studying for the GED and that she would be sitting for the examination soon. R. 356. She reiterated that the Adderall was helping her with her concentration. R. 356. Dr. Liu's examination revealed no changes in her condition, R. 356, and he maintained Smith's prescriptions at the same dosages, R. 343.

Dr. Liu saw Smith on July 20, 2010 and August 17, 2010. R. 536-37. Smith reported feeling anxious about her GED examination and about her application for SSI benefits. R. 356-57. Dr. Liu's examination revealed no changes in her condition, R. 356-57, and he maintained Smith's prescriptions at the same dosages, R. 343, 522.

Dr. Liu saw Smith on September 14, 2010. R. 538. Smith reported feeling anxious and stressed because she had failed her GED examination and would have to repeat the class. R. 538. She also reported feeling worried about having to care for her two children. R. 538. Dr. Liu's examination revealed no changes in her condition, R. 358, and he maintained Smith's prescriptions at the same dosages, R. 522.

Dr. Liu saw Smith on October 12, 2010; November 9, 2010; and December 7, 2010. R. 539, 523. Dr. Liu's examination revealed no changes in her condition, R. 539, 523, and he maintained Smith's prescriptions at the same dosages, R. 522-23.

b.    *October 2009: Arbor WeCare*

On October 9, 2009 Smith underwent a biopsychosocial assessment at Arbor WeCare conducted by intake specialist and medical case manager Leroy Hogans. R. 232-47. Smith stated that she had been living in a three-quarter house for the past year and three months.

R. 235.  She also stated that she had an open Administration for Children's Services ("ACS")

case because she had been accused of drug use and neglect.  R. 236.  She reported that she had a

history of drug abuse within the previous three years, using cocaine two to three times per week.

R. 237.  She reported receiving outpatient treatment at the Realization Center, Inc. ("Realization

Center") in 2009 and that she was no longer using cocaine.  R. 237.

Smith stated that she was able to travel independently by bus and train and that

she had traveled independently to her appointment.  R. 238.  She reported that she was able to

conduct daily activities, including washing dishes and clothes, sweeping and mopping the floor,

vacuuming, making the bed, shopping for groceries, and cooking meals.  R. 238-39.

Smith reported that she was receiving mental health treatment from Dr. Liu, who

had diagnosed her with depression.  R. 234-35.  She reported taking Wellbutrin, Nortriplyline,[52]

Trazodone, Lyrica, and Xanax.  R. 235.  She also reported receiving mental health treatment at

Arms Acres in 2008.  R. 233-34.  Hogans asked Smith a series of depression screening questions,

on the basis of which he rated the severity of her depression as mild.  R. 234.

c.    *February 2010: Realization Center, Inc.*

On February 22, 2010 Smith underwent an evaluation by Giovanni K. LaDuke,

L.M.S.W., at the Realization Center for cocaine dependence and opioid abuse, upon the referral

of ACS.  R. 370-39.  Smith described compulsive behavior involving drugs, which she used to

cope with parenting stressors and feelings of loneliness and rejection.  R. 273.  She stated that

her primary drug was cocaine, which she used on a daily basis since the age of 20, and had last

used two years earlier.  R. 375.  She also stated that she had abused Fioricet, an opioid, on a daily

basis since the age of 17, and had last used two years earlier.  R. 375.  She reported inpatient

_____

[52]       Nortriptyline is a "used to treat mental/mood problems such as depression."  *Nortriptyline*,
WEBMD, http://www.webmd.com/drugs/drug-10710-
nortriptyline+Oral.aspx?drugid=10710&drugname=nortriptyline+Oral&source=0.

treatment at Arms Acres for 28 days in 2008 and outpatient treatment at Coney Island Hospital for two months in 2008 and at the Realization Center for one year in 2009.  R. 376.

Smith reported currently taking Nexium for her stomach problems and Imitrex for her migraines.  R. 373.  She also stated that she had depression and generalized anxiety disorder, for which she took Lexapro, Celexa,[53] Wellbutrin, Xanax, and Trazodone.  She denied a history of psychiatric hospitalization and did not report seeing a psychiatrist.  R. 374.

Smith stated that she had daily contact with her two children.  R. 371.  She stated that she had last worked as a cashier in 1997 and that she stopped working due to "stomach problems."  R. 372.  She stated that she was currently in a relationship of one year and three months' duration and had been living with the individual for three months.  R. 371-72.  She described spending her spare time reading biographies and spending quality time with her children.  R. 372.

LaDuke diagnosed Smith with cocaine dependence, opioid dependence, depression, and generalized anxiety disorder on Axis I.  With respect to Smith's Axis IV diagnosis, she noted that Smith's problems included limited insight into her addiction, lack of sober support, family discord issues, unemployment, and legal issues.  R. 379.  She gave Smith a GAF score of 46.[54]

On March 30, 2010 Smith underwent a psychiatric/psychological evaluation at the Realization Center.  R. 381-82.  Smith reported a depressed mood of several months' duration, decreased energy and concentration, decreased appetite, and increased fatigue and sleep ("all

---

[53]     Celexa is used to treat depression "by helping to restore the balance of a certain natural substance (serotonin) in the brain."  *Celexa*, WEBMD, http://www.webmd.com/drugs/drug-8603-Celexa+Oral.aspx?drugid=8603&drugname=Celexa+Oral&source=1.

[54]     A GAF score between 41 and 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  DSM-IV-TR, *supra* note 51, at 34.

day").  R. 381.  She reported occasionally having panic attacks on the train, with the most recent one occurring one month earlier.  R. 381.  She reported a history of cocaine and opioid dependence, a history of depression and anxiety, and chronic back pain due to a herniated disc.  R. 381.  She reported seeing Dr. Liu for outpatient treatment for depression and anxiety up to a year earlier.  R. 341.  She stated that Dr. Liu had prescribed Lexapro, Wellbutrin, Celexa, and Xanax.  R. 341.  She stated that she had not used cocaine or Fioricet for two years.  R. 341.  She stated her current medications were Nexium and Imitrex.  R. 341.

Upon mental examination, Smith appeared calm and cooperative.  R. 382.  She was well dressed and groomed.  R. 382.  She related well and made good eye contact.  R. 382.  She spoke slowly at a normal volume.  R. 382.  Her thought process was linear and organized.  R. 382.  Her mood was "'depressed' with euthymic affect."  R. 382.

The examiner diagnosed Smith with cocaine dependence, opioid dependence, major depressive disorder, and anxiety on Axis I.  R. 382.  He indicated a history of substance abuse as an Axis IV problem.  R. 382.  He gave Smith a GAF score of 50.  He prescribed Zoloft and instructed Smith to continue group therapy.  R. 380, 382.

A discharge summary from the Realization Center prepared on March 30, 2010 indicated that Smith's toxicology screens were negative and that her attendance in group therapy had been poor.  R. 370.

d.      *April 2010: Dr. Christina O'Flaherty*

On April 2, 2010 Smith underwent a consultative psychiatric examination by Dr. Christina O'Flaherty at Industrial Medicine upon referral by the New York State Office of

Temporary and Disability Assistance.  R. 319-23.  Smith reported that she lived with her mother and two children.  R. 319.  She indicated that she had an eighth grade education and was currently not employed.  R. 319.  Smith indicated that she last worked in 1996 as a cashier and that she was unable to continue working as a result of migraines, an addiction to her migraine medication, and fatigue.  R. 319.

Smith reported a history of psychiatric hospitalizations in the 1990s and later in 2007 or 2008 at Coney Island Hospital.  R. 319.  She also indicated that she began seeing a therapist in 2009 and had begun a program in March 2010 at the Realization Center, where she saw both a therapist and a psychiatrist.  R. 319.  She reported her chronic and current medical conditions to include migraines, gastritis, back pain, and neck pain.  R. 319.  She indicated that she was taking Zoloft, Alprazolam, Imitrex, Allegra, Nexium, Adderall, Trazodone, and Endocet.  R. 319.

Smith reported that she had been experiencing a depressive episode over the past few months.  R. 320.  She indicated her symptoms included dysphoric mood, crying spells, irritability, fatigue, loss of energy, and difficulty caring for herself.  R. 320.  She reported that she wakes frequently at night and had lost seven pounds in recent weeks.  R. 320.  She denied suicidal or homicidal ideation.  R. 320.  She indicated that she has suffered from panic attacks "a few times" and has also experienced symptoms of mania.  R. 320.  She denied symptoms of a thought disorder.  R. 320.

Smith indicated that she began using cocaine beginning when she was 21 years old and had stopped using two years ago.  R. 320.  She also indicated that she developed an addiction to Fioricet when she was 17 years old and had discontinued its use two years ago.  R.

320. She reported that she was admitted to Coney Island Hospital for detoxification for seven days and attended a rehabilitation program at Arms Acres for 28 days in 2008. R. 320.

Smith reported that she could perform activities of daily living but that she required assistance due to difficulty bending and lifting. R. 321. She denied socializing regularly with friends and family members, but reported a good relationship with members of her family. R. 321-22. She stated that she spends her time watching television. R. 321.

Upon mental status examination, Smith was cooperative, but her overall manner of relating was somewhat poor as she was withdrawn. R. 320. She was disheveled and poorly groomed. R. 321. Her gait, posture, and motor behavior were normal, and her eye contact was appropriate. R. 321. Smith's speech intelligibility was fluent and her expressive and receptive language were adequately developed. R. 321. Her thought processes were coherent and goal-directed. R. 321. There was no evidence of hallucinations, delusions, or paranoia. R. 321. Smith's affect was dysphoric and her mood was dysthymic. R. 321. Her attention and concentration were intact, as were her recent and remote memory skills. R. 321. Her intellectual functioning appeared to be in the average to below average range and her general fund of information appeared to be somewhat fair. R. 321. Her insight and judgment were fair. R. 321.

Dr. O'Flaherty diagnosed Smith with bipolar disorder, panic disorder without agoraphobia, and polysubstance dependence in full sustained remission on Axis I. R. 322. She opined that Smith was able to follow and understand simple directions and perform simple tasks independently. R. 322. She opined that Smith might have difficulty maintaining attention and concentration and maintaining a regular schedule. R. 322. Smith appeared able to learn new simple tasks and to perform complex tasks independently. R. 322. Dr. O'Flaherty opined that

Smith might have difficulty making appropriate work-related decisions, relating adequately with orders, and dealing appropriately with stress.  R. 322.

e.      *April 2010: Dr. J. Belsky*

On April 12, 2010 Dr. J. Belsky, a state psychiatric consultant, reviewed the medical evidence of record and completed a psychiatric review technique.  R. 283-96.  Dr. Belsky opined that Smith's affective disorder did not satisfy the diagnostic criteria of Listing 12.04, R. 286, and that her substance addiction disorder did not satisfy the diagnostic criteria of Listing 12.09 of the Listing of Impairments, R. 291.  With respect to the "B" criteria of the Listing of Impairments, which denote functional limitations, Dr. Belsky opined that Smith had mild restrictions of activities of daily living and moderate difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace.  R. 293.  Dr. Belsky also opined that Smith had one or two episodes of deterioration, each of extended duration.  R. 293.

Dr. Belsky also assessed Smith's mental residual functional capacity.  R. 271-74. She concluded that Smith was not significantly limited in her understanding and memory, consisting of the abilities to remember locations and work-like procedure, understand and remember very short and simple instructions, and understand and remember detailed instructions.  R. 271.  She concluded that Smith was not significantly limited in certain areas of sustained concentration and persistence, such as the abilities to carry out very short and simple instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; and make simple work-related decisions.  R. 272.  She concluded that Smith was moderately limited in other areas of sustained concentration and persistence, such as the abilities to carry out detailed instructions, maintain attention and concentration for extended periods, and complete a normal

workday without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number of rest periods.[55]  R. 272.

Dr. Belsky concluded that Smith was not significantly limited in certain areas of social interaction, such as the abilities to ask simple questions or request assistance and get along with coworkers without distracting them or exhibiting behavioral extremes.  R. 272.  She concluded that Smith was moderately limited in other areas of social interaction, such as the abilities to interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, and maintain socially appropriate behavior and adhere to basic standards of cleanliness.  R. 272.

Dr. Belsky concluded that Smith was not significantly limited in most areas of adaptation, such as the abilities to be aware of normal hazards and take appropriate precautions, travel in unfamiliar places or use public transportation, and set realistic goals or make plans independently of others.  R. 272.  She concluded that Smith was moderately limited in one area of adaptation, consisting of the ability to respond appropriately to changes in the work setting.  R. 272.

Dr. Belsky concluded that Smith had the mental residual functional capacity to perform simple tasks in a low stress work setting.  R. 273.

3.    *Non-Duplicative Evidence Submitted to the Appeals Council After the ALJ's Decision*

a.    *Medical Evidence Prior to the ALJ's Decision*

On February 12, 2009 Dr. Marina Neystat, a neurologist, evaluated Smith.  R. 541-43.  Smith complained of headaches associated with blurred vision and numbness in her

---

[55]       Dr. Belsky marked that Smith was both not significantly limited and moderately limited with respect to the ability to work in coordination with or in proximity to others without being distracted, a particular area of sustained concentration and persistence,.  R. 271.

face.  R. 541.  She indicated that the symptoms had been ongoing for several years.  R. 541.  She reported that Tylenol partially relieved them but that Topamax[56] did not.  R. 541. Smith also complained of numbness in her hands and a longstanding history of neck pain and stiffness.  R. 541.  She rated her pain as a six on a scale of one to ten.  R. 541.

Dr. Neystat's examination of Smith's cranial nerves revealed no abnormalities. R. 542.  An examination of her motor skills revealed full muscle strength in all groups tested, no muscle atrophy, and good muscle tone.  R. 542.  The pronator drift test[57] revealed the same level maintained bilaterally.  R. 542.  Smith's sensations were normal.  R. 542-43.

Dr. Neystat's examination of Smith's back revealed cervical right and left paraspinal tenderness and muscle spasms.  R. 543.  Her lateral flexion of the neck was decreased. R. 543.  The cervical compression test was negative.  R. 543.  The thoracic and lumbar spine ranges of motion were within normal limits.  R. 543.  Tinel's test was abnormal bilaterally.[58]  R. 543.

Dr. Neystat's diagnoses were intractable migraines, depression, and cervical radiculopathy.  R. 543.  She recommended EMG and NCV studies and physical therapy evaluation.  R. 543.  She prescribed a trial of Nortriptyline and suggested Smith taper off the Topamax.  R. 543.

---

[56] Topamax is "used to prevent migraine headaches and decrease how often you get them." *Topamax*, WEBMD, http://www.webmd.com/drugs/mono-6019-TOPIRAMATE+-+ORAL.aspx?drugid=14494&drugname=Topamax+Oral&source=1.

[57] The pronator drift test is "[a] routine procedure in a neurological examination in which patients are asked to extend both arms anteriorly and hold them at shoulder height with the palms facing up . . . for at least 10 s[econds] while keeping their eyes closed."  If "one of the arms . . . drift[s] (up, down, or out) and/or . . . the hand . . . . pronate[s] (turn palm down)," "[s]uch a response can be indicative of either an upper motor neuron lesion anywhere along the neuroaxis, or . . . a disturbance of proprioception anywhere from the parietal cortex down." *Pronator Drift*, ENCYCLOPEDIA OF CLINICAL NEUROPSYCHOLOGY, http://www.springerreference.com/docs/html/chapterdbid/183563.html.

[58] Tinel's sign is a "sign that a nerve is irritated" and is "positive when lightly banging (percussing) over the nerve elicits a sensation of tingling, or 'pins and needles,' in the distribution of the nerve." *Tinel's Sign Definition*, MEDICINENET.COM, http://www.medterms.com/script/main/art.asp?articlekey=16687.

On March 27, 2009 Smith returned to Dr. Neystat and reported that her headaches had significantly improved since the last visit. R. 544-46. Dr. Neystat's evaluation and diagnoses remained the same except that she concluded there was no evidence of carpal tunnel syndrome. R. 546. She recommended Smith continue Nortryiptyline and consider tapering off of Topamax. R. 546.

On August 6, 2009 Smith underwent an MRI of the cervical and lumbar spines. R. 551-52. The MRI of the cervical spine revealed degenerative changes and posterior disc changes and central canal stenosis at C4-C5 and C5-C6 that touched the anterior aspect of the spinal cord. R. 551. A minimal mass effect on the cord was noted at C4-C5. R. 551. The MRI of the lumbar spine revealed degenerative changes including multilevel disc bulges and protrusions. R. 552.

b.      *Medical Evidence after the ALJ's Decision*

On June 20, 2011 Smith underwent an MRI of her cervical spine. R. 547-48. The MRI revealed a partial reversal of lordosis,[59] multilevel disc space narrowing and disc space loss of normal signal, disc bulge and/or herniation throughout the cervical spine (except for C2-C3), central canal stenosis at C4-C5 and C5-C6 where disc changes press on the spinal cord, left-sided proximal neuroforaminal narrowing[60] at C5-C6 and C6-C7, and increased severity of the disc bulge and small posterocentral herniation at C5-C6. R. 547-48.

Smith also underwent an MRI of her lumbar spine on the same day. R. 549-50. The MRI revealed mild scoliosis; bilateral neuroforaminal narrowing at L3-L4 and L4-L5; left-

---

[59]      Lordosis is "an increased curving of the spine." *Lordosis*, MEDLINEPLUS, http://www.nlm.nih.gov/medlineplus/ency/article/003278.htm.
[60]      Neuroforaminal narrowing refers to "a reduction of the size of the opening in the spinal column through which the spinal nerve exits." This narrowing compresses the nerve, which can "lead to pain that radiates along the path of the nerve." *Neuroforaminal Narrowing*, SPINE-HEALTH, http://www.spine-health.com/glossary/neuroforaminal-narrowing.

sided neuroforaminal narrowing at L2-L3; disc bulge and/or herniation at L2-L3, L3-L4, L4-L5, and L5-S1; disc space narrowing at L4-L5; increased severity of disc bulge at L4-L5; an annular tear at L4-L5; and a disc herniation at L2-L3.  R. 549-550.

D.    *Vocational Expert Testimony*

Christina Boardman testified as a vocational expert ("VE") at the hearing on November 22, 2010.  R. 52-56.  Boardman identified Smith's past work as a cashier with an SVP[61] of 2 and an exertional level of light.  R. 52-53.

The ALJ posited a hypothetical to Boardman concerning an individual of Smith's age, education, and work experience who could lift and carry twenty pounds occasionally and ten pounds frequently, stand and walk for six hours a day, sit for six hours a day, and occasionally climb, balance, stoop, kneel, crouch, and crawl.  R. 53.  In addition, this individual could understand, remember, and carry out simple instructions and maintain attention and concentration for simple tasks, but would be limited to low-stress work requiring only occasional decision-making and judgment, changes in the work setting, and contact with supervisors, co-workers, and the general public.  R. 53.  Boardman testified that such an individual could not perform Smith's past work.  R. 53.

Boardman then testified that the same hypothetical individual would be able to perform other work.  R. 53.  She proceeded to highlight examples of such work and estimate the job numbers for each position.  R. 53-54.  She identified the position of food sorter, which is classified as sedentary and unskilled.  R. 54.  She estimated that there were 7,690 such jobs regionally and 4,472,900 such jobs nationally.  R. 54.  She identified the position of label coder,

---

[61]    "SVP" stands for "Specific Vocational Preparation" and refers to the amount of time "required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."  The SVP ranges from 1 ("short demonstration only") to 9 ("over 10 years").  A SVP of 2 corresponds to anything beyond a short demonstration up to and including one month.  U.S. DEP'T OF LABOR, DICTIONARY OF OCCUPATIONAL TITLES app. C (4th ed. 1991).

which is classified as light and unskilled.  R. 54.  She estimated that there were 7,080 such jobs regionally and 524,440 such jobs nationally.  R. 54.  She identified the position as mail clerk, which is classified as light and unskilled.  R. 54.  She estimated that there were 6,380 such jobs regionally and 70,577 such jobs nationally.  R. 54.

The ALJ then asked Boardman whether the same hypothetical individual, if limited to carrying ten pounds occasionally and less than ten pounds frequently, and standing and walking for two hours would still be able to perform these types of work.  R. 54-55.  Boardman testified that the food sorter position, which was classified as sedentary, would still be available to such a hypothetical individual, as well as other sedentary positions, such as addresser and surveillance monitor.  R. 55-56.  She estimated that, with respect to the addresser, there were 10,360 such jobs regionally and 139,420 such jobs nationally and that, with respect to the surveillance monitor, there were 5,964 such jobs regionally and 85,440 such jobs nationally.  R. 55-56.

The ALJ then asked Boardman whether any jobs existed that the same hypothetical individual could perform if unable to maintain concentration, persistence, or pace for a two-hour period.  R. 56.  Boardman denied the existence of such jobs.  R. 56.

## DISCUSSION

A.      *The Legal Standard*

Under the Social Security Act, Smith is entitled to disability benefits if, "by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months," 42 U.S.C. § 423(d)(1)(A), she "is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which

exists in the national economy," *id*. § 423(d)(2)(A). The Social Security Administration's regulations prescribe a five-step analysis for determining whether a claimant is disabled:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If [s]he is not, the Commissioner next considers whether the claimant has a severe impairment which significantly limits [her] physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider [her] disabled without considering vocational factors such as age, education, and work experience; the Commissioner presumes that a claimant who is afflicted with a listed impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, [s]he has the residual functional capacity to perform [her] past work. Finally, if the claimant is unable to perform [her] past work, the Commissioner then determines whether there is other work which the claimant could perform.

*DeChirico*, 134 F.3d at 1179-80 (internal quotation marks and alterations omitted) (quoting *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982)); *see also* 20 C.F.R. § 404.1520(a)(4)(i)-(v) (setting forth this process). The claimant bears the burden of proof in the first four steps, the Commissioner in the last. *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003).

Under 42 U.S.C. § 405(g), I review the Commissioner's decision to determine whether the correct legal standards were applied, and whether the decision is supported by substantial evidence. *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). The former determination requires the court to ask whether "the claimant has had a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purposes of the Act." *Echevarria v. Secretary of Health and Human Services*, 685 F.2d 751, 755 (2d Cir. 1982). The latter determination requires the court to ask whether the decision is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v.*

*Perales*, 402 U.S. 389, 401 (1971).

The district court is empowered "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). A remand by the court for further proceedings is appropriate when "the Commissioner has failed to provide a full and fair hearing, to make explicit findings, or to have correctly applied the . . . regulations." *Manago v. Barnhart*, 321 F.Supp.2d 559, 568 (E.D.N.Y.2004). A remand to the Commissioner is also appropriate "[w]here there are gaps in the administrative record." *Rosa v. Callahan*, 168 F.3d 72, 82–83 (2d Cir.1999) (quoting *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996)).

B.      *The ALJ's Rejection of Smith's Disability Claim*

The ALJ followed the five-step procedure outlined above for determining whether Smith was disabled within the meaning of the Social Security Act. She determined first that Smith had not engaged in substantial gainful activity since January 2, 1997. R. 68. She next determined that Smith was afflicted with severe impairments: degenerative disc disease, major depressive disorder, and generalized anxiety disorder. R. 68.

1.      *Step Three*

Under the third step of the analysis, the ALJ found that Smith's impairments did not meet or medically equal one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. 69 (citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.926). The ALJ considered Smith's degenerative disc disease under the rubric of Listing 1.04. R. 69. Under that listing, "the claimant must establish a disorder of the spine, resulting in compromise of a nerve root with loss of spinal motion, motor loss, and positive straight-leg

raising studies." R. 69; *see also* 20 C.F.R. Part 404, Subpart P, Appendix 1, 1.04. The claimant may also meet this listing by providing evidence of "documented spinal arachnoiditis with attendant symptoms of burning or painful dysthesia, or [of] spinal stenosis with pseudoclaudication, resulting in ineffective ambulation." R. 69; *see also* 20 C.F.R. Part 404, Subpart P, Appendix 1, 1.04. The ALJ found that none of Smith's medical records established "findings or symptoms severe enough to qualify" under this listing. R. 69.

      The ALJ also considered Smith's major depressive disorder and generalized anxiety disorder under the rubric of Listings 12.04 and 12.06. R. 69-70. Listing 12.04 describes affective disorders "[c]haracterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome." 20 C.F.R. Part 404, Subpart P, Appendix 1, 12.04. Listing 12.06 describes anxiety-related disorders where "anxiety is either the predominant disturbance or . . . is experienced if the individual attempts to master symptoms." *Id*. at 12.06. The "required level of severity for these disorders is met when" the criteria in both paragraphs A and B are satisfied,[62] or when at least one of the criteria in paragraph C is satisfied.[63] *Id*.

---

[62]    Paragraphs A and B of Listing 12.04 state the following criteria:

A. Medically documented persistence, either continuous or intermittent, of one of the following:

    1. Depressive syndrome characterized by at least four of the following:

        a. Anhedonia or pervasive loss of interest in almost all activities; or
        b. Appetite disturbance with change in weight; or
        c. Sleep disturbance; or
        d. Psychomotor agitation or retardation; or
        e. Decreased energy; or
        f. Feelings of guilt or worthlessness; or
        g. Difficulty concentrating or thinking; or
        h. Thoughts of suicide; or
        i. Hallucinations, delusions, or paranoid thinking; or

    2. Manic syndrome characterized by at least three of the following:

        a. Hyperactivity; or

        b. Pressure of speech; or

        c. Flight of ideas; or

        d. Inflated self-esteem; or

        e. Decreased need for sleep; or

        f. Easy distractibility; or

        g. Involvement in activities that have a high probability of painful consequences which are not recognized; or

        h. Hallucinations, delusions or paranoid thinking;or

3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);

AND

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration;

20 C.F.R. Part 404, Subpart P, Appendix 1, 12.04.

Paragraph A of Listing 12.06 states the following criteria:

A. Medically documented findings of at least one of the following:

1. Generalized persistent anxiety accompanied by three out of four of the following signs or symptoms:

        a. Motor tension; or

        b. Autonomic hyperactivity; or

        c. Apprehensive expectation; or

        d. Vigilance and scanning; or

2. A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or

3. Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or

4. Recurrent obsessions or compulsions which are a source of marked distress; or

5. Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress;

*Id*. at 12.06. Paragraph B of Listing 12.06 is identical to Paragraph B of Listing 12.04.

The ALJ concluded that Smith failed to meet the criteria of paragraph B for both Listing 12.04 and 12.06.  R. 69.  With respect to activities of daily living, the ALJ found that Smith had mild restrictions.  R. 69.  She noted that Smith "was able to study for the GED and reported to Arbor WeCare that she could use public transport, wash dishes, do laundry, vacuum, make beds, sweep, shop, and cook."  R. 69.  With respect to social functioning, the ALJ found that Smith had moderate difficulties.  R. 69.  While Smith "reported being withdrawn," the ALJ found that "the medical evidence does [not] document marked problems getting along with others."  R. 69.  With respect to concentration, persistence, or pace, the ALJ found that Smith had moderate difficulties.  R. 69.  While Smith "was able to study for the GED, she reported no[t] passing the test."  R. 69.  At the same time, the ALJ cited the consultative examiner's conclusion that Smith's memory and concentration were intact.  R. 69.  Finally, the ALJ found that Smith had experienced no episodes of decompensation of extended duration.  R. 69.

The ALJ also concluded that Smith failed to meet the criteria of paragraph C.  R. 69-70.  With respect to Listing 12.04, the ALJ summarily found that the record failed to contain

---

[63]  Paragraph C of Listing 12.04 states the following criteria:

C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or

2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

*Id*. at 12.04.
  Paragraph C of Listing 12.06 states the following criteria:  "C. Resulting in complete inability to function independently outside the area of one's home.  *Id*. at 12.06.

evidence establishing that Smith met the criteria.  R. 69-70.  With respect to Listing 12.06, the ALJ found that "the record [did] not indicate that the claimant's anxiety disorder has resulted in complete inability to function independently outside the area of her home."  R. 70.

2.    *RFC Assessment*

The ALJ then determined that Smith had the RFC to perform sedentary work except that she could "perform postural activities only occasionally," "understand, remember and carry out only simple instructions, maintain attention and concentration only for simple tasks," and had to perform "low stress work."[64]  R. 70 (citing 20 C.F.R. §§ 404.1567(a), 416.967(a)).  In arriving at this determination, the ALJ considered Smith's statements and testimony, her medical records, and opinion evidence.  R. 70 (citing 20 C.F.R. §§ 404.1527, 404.1529, 416.927, 416.929).

The ALJ determined that Smith's medically determinable impairments – degenerative disc disease, major depressive disorder, and generalized anxiety disorder – "could reasonably be expected to cause the alleged symptoms."  R. 71.  However, she found that Smith's "statements concerning the intensity, persistence and limiting effects of these symptoms . . . not credible to the extent they are inconsistent with the above residual functional capacity assessment."  R. 71.  While the ALJ admitted Smith's "impairments cause more than minimal functional limitations," she found that "the record does not support a finding that these limitations are disabling."  R. 71.  She also noted that Smith's "inconsistent work history [did] not enhance her credibility."  R. 71.

With respect to Smith's physical impairments, the ALJ identified several pieces of evidence in the record to support her decision.  First, she highlighted the records of Dr. Eugene

---

[64]    The ALJ defined low stress work as "work with only occasional decision making and judgment, only occasional changes in work setting, procedures and tools, and only occasional contact with supervisors, coworkers, and the general public."  R. 70.

Bulkin, who treated Smith for her back pain.  R. 71.  The ALJ noted that "[a]lthough MRIs of the lumbosacral and cervical spine revealed several disc bulges and herniations, and an EMG supported a finding of L5-S1 radiculopathy, the treatment record [did] not support a finding of limitations of the severity alleged by" Smith.  R. 71.  For example, at Smith's most recent examination on February 2, 2010, the ALJ noted that she "reported a very good response to epidural steroid injection, and presented with a normal gait, the ability to heel and toe walk without difficulty, normal rotation and extension of the lumbar spine, no focal sensory or motor deficits, normal and symmetrical reflexes, and a negative straight leg raising test."  R. 71.  The ALJ observed that while Dr. Bulkin opined on November 17, 2009 that Smith would be unable to work for 12 months, this opinion was "undermined by the treatment notes indicating that [Smith]'s condition indeed improved within the span of a few months."  R. 71.

Second, the ALJ pointed to treatment records from Dr. Lifschutz, which failed to "indicate that [Smith] suffers from limitations exceeding the above residual functional capacity assessment, as [Smith] has reported that her physical therapy, acupuncture, and trigger point injections are helpful."  R. 71.  Third, the ALJ noted the results of Smith's consultative examination with Dr. Louis Tranese on April 2, 2010.  R. 71-72.  Dr. Tranese observed that Smith had "a normal gait, full cervical and lumbar ranges of motion, normal spasm, negative straight leg raising, and full strength and range of motion in the lower extremities."  R. 71.  Dr. Tranese opined that Smith had "moderate limitations in heavy lifting, mild to moderate limitations in frequent bending, squatting, kneeling, crouching and crawling, and mild limitations in long distance walking [and] frequent stair climbing."  R. 72.

The ALJ did not accord significant weight to "[t]he limitations assigned by Dr. Hugo Velarde-Lasso as they [were] not supported by treatment notes or objective medical test

results." R. 72. She noted that although Dr. Velarde-Lasso "was issued a subpoena, he did not respond with the necessary documentation." R. 72.

With respect to Smith's physical impairments, the ALJ highlighted the treatment notes of Dr. Shang Liu. R. 72. These notes indicated that while Smith "has had some difficulty concentrating . . . she reported improvement with medication, to the extent that she was able to study for the GED exam." R. 72. Moreover, the ALJ noted that Smith's GAF, which was 55-60 as of June 24, 2009, was "consistent with moderate to severe symptoms." R. 72.

The ALJ also considered the results of Smith's consultative examination with Dr. Christina O'Flaherty on April 2, 2010. R. 72. At the examination, Dr. O'Flaherty noted that Smith "was withdrawn but cooperative, had intact memory, attention, and concentration, had fair insight and judgment, and displayed average to low average intelligence." R. 72. Dr. O'Flaherty opined that Smith "would have some difficulty making appropriate decisions [and] relating adequately and appropriately dealing with stress." R. 72.

3.    *Steps Four and Five*

In the fourth step of the analysis, the ALJ concluded, on the basis of her RFC determination, that Smith was unable to perform her past relevant work as a cashier. R. 72. Moving on to the fifth and final step, the ALJ found that considering Smith's age, education, work experience, and RFC, jobs existed in significant numbers in the national economy that Smith could perform. R. 72-73 (citing 20 C.F.R. §§ 404.1569, 404.1569(a), 416.969, 416.969(a)). She found that although Smith's additional limitations prohibited her from performing the full range of sedentary work, the testimony of the vocational expert established that jobs existed in the national economy (*e.g.*, food sorter, addresser, and surveillance monitor)

for an individual with Smith's particular limitations. R. 73. Accordingly, the ALJ concluded that Smith was not disabled within the meaning of the Social Security Act. R. 73-74.

C.      *Analysis of the ALJ's Decision*

    1.      *Listing 1.04A*

In the ALJ's analysis under step three of the five-step inquiry, she concluded that Smith's physical impairment did not meet Listing 1.04 because "none of the medical records establish[] findings or symptoms severe enough to qualify" under the listing. R. 69. Smith asserts that "the objective evidence establishes that she meets or equals Listing 1.04A." Smith Mem. in Support Cross-Motion J. Pleadings 5. Alternatively, Smith argues that "the evidence was such that [she] was owed a more substantive discussion of why she did not meet listing 1.04A, as opposed to the [ALJ's] boiler-plate assertion." *Id.* (citations and internal quotation marks omitted).

    Listing 1.04A defines a disorder of the spine as follows:

> 1.04   Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> > A.  Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

"For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria." *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990) (emphasis in original). "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Id.*

The Second Circuit has cautioned that the ALJ "should set forth a sufficient rationale in support of his decision to find or not to find a listed impairment." *Berry*, 675 F.2d at 469. Such a rationale is particularly important in cases where a reviewing court "would be unable to fathom the ALJ's rationale in relation to evidence in the record, especially where credibility determinations and inference drawing is required of the ALJ." *Id*. The Second Circuit has noted that, in such cases, "we would not hesitate to remand the case for further findings or a clearer explanation for the decision." *Id*. On the other hand, where a reviewing court is "able to look to other portions of the ALJ's decision and to clearly credible evidence in finding that his determination was supported by substantial evidence," the absence of an express rationale does not prevent the court from upholding such a determination. *Id*.

At the outset, I note that Smith's two arguments in support of reversal of the ALJ's determination with respect to Listing 1.04A are in tension with one another. Smith's first argument is that the evidence in the record establishes that her physical impairment meets or equals Listing 1.04A. But in laying out her second argument – that the ALJ erred in failing to articulate a sufficient rationale for finding that Smith did not meet Listing 1.04A – Smith observes that the record "contains conflicting evidence which needs to be resolved." Smith Mem. in Support Cross-Motion J. Pleadings 9; Smith Reply in Support Cross-Motion J. Pleadings 3. She continues by arguing that "normally weighing and considering this conflicting evidence is exactly the function of an Administrative Law Judge" and that "this is exactly what the ALJ failed to do in this case." Smith Reply in Support Cross-Motion J. Pleadings 3.

Smith's second argument has merit and I conclude that the ALJ's determination was not supported by substantial evidence in the record. As an initial matter, the ALJ's rationale for determining whether Smith's physical impairment meets Listing 1.04A is limited to the

single statement that "none of the medical records establish[] findings or symptoms severe enough to qualify under listing 1.04." R. 69. This statement is belied by evidence in the record, which indicate or suggest that Smith suffered symptoms satisfying each criterion of Listing 1.04A. First, the record indicates that Smith has a "disorder of the spine . . . resulting in the compromise of a nerve root."[65] Smith Mem. in Support Cross-Motion J. Pleadings 5-6 (citing June 4, 2010 cervical and lumbar MRIs demonstrating, *inter alia*, a herniated nucleus pulposus and bulging discs "deforming the thecal sac" and L3, L4, and L5 nerve roots). Second, the record indicates that Smith suffered nerve root compression characterized by neuro-anatomic distribution of pain.[66] Smith Mem. in Support Cross-Motion J. Pleadings 6 (citing Dr. Lifschutz's treatment notes describing neck pain radiating into both shoulders and lower back pain radiating into the right thigh); *id.* at 10 (citing June 4, 2010 lumbosacral MRI demonstrating deformed nerve roots at L3, L4, and L5 and June 24, 2010 NCV study revealing evidence of a right L4-L5 radiculopathy). Third, the record indicates that Smith exhibited a limited range of motion in her spine. *Id.* at 7 (citing Dr. Lifschutz's treatment notes describing limited range of motion of both cervical and lumbosacral spine).[67] Fourth, the record suggests that Smith suffered motor loss as indicated by muscle weakness. *Id.* (citing Dr. Lifschutz's treating notes describing difficulty walking on heels and toes). Fifth, the record suggests that Smith suffered reflex loss. *Id.* at 8 (citing Dr. Lifschutz's treating notes describing "sluggish ankle jerks" and Dr. Tranese's consultative examination noting absence of bilateral ankle jerk reflexes). Finally,

---

[65]     The Commissioner does not dispute that evidence in the record indicates that Smith suffers from a spine disorder resulting in compromise of a nerve root.

[66]     The Commissioner disputes that the record establishes "pain in a *specific* neuro-anatomic distribution as required by Listing 1.04A" and argues that Smith's plain "was described as radiating to the right lower extremity, with no specific distribution set forth." Comm'r Mem. in Support Mot. J. Pleadings 2 (emphasis added). However, the requirement that the neuro-anatomic distribution of pain be "specific" appears nowhere in the language of Listing 1.04A.

[67]     The Commissioner does not dispute that evidence in the record indicates that Smith exhibited a limited range of motion in her spine.

the record indicates that Smith had numerous positive straight leg raising tests."[68] *Id.* (citing

October 9, 2009 Arbor WeCare physical examination, Dr. Bulkin's treatment notes, and Dr.

Lifschutz's treatment notes describing positive straight leg raising tests).

The ALJ's decision does cite to several pieces of evidence that support her

determination.[69] First, the ALJ cites to evidence suggesting that Smith did not suffer motor loss

as indicated by muscle weakness. In particular, the ALJ cited to a February 2, 2010 treatment

note from Dr. Bulkin describing Smith as walking on heels and toes without difficulties. R. 360

(repeated at 490); *see also* Comm'r Reply in Supp. Mot. J. Pleadings 2-3 (citing Dr. Bulkin's

treatment notes). The ALJ also cited to Dr. Tranese's April 2, 2010 consultative examination,

which found Smith walked on her heels and toes without difficulty and exhibited full motor

strength in her lower extremities. R. 278-79. Second, the ALJ cites to evidence suggesting that

Smith did not suffer reflex loss. Specifically, the ALJ cited to Dr. Bulkin's February 2, 2010

treatment note describing Smith as having normal and symmetrical reflexes. R. 360 (repeated at

490); *see also* Comm'r Reply in Supp. Mot. J. Pleadings 3 (citing Dr. Bulkin's treatment

notes).[70] Finally, the ALJ cites to evidence indicating that Smith's performance on the straight

leg raising test was inconsistent throughout the record. Dr. Bulkin, for example, found Smith's

straight leg raising to be negative bilaterally in his February 2, 2010 treatment note. R. 360

(repeated at 490); *see also* Comm'r Reply in Supp. Mot. J. Pleadings 3 (citing Dr. Bulkin's

---

[68]     The Commissioner disputes that the record contains evidence establishing the final three criteria for meeting Listing 1.04A. Comm'r Reply in Support Mot. J. Pleadings 2-3. In support of its argument, the government presents *conflicting* evidence, rather than evidence that unequivocally supports a finding one way or the other. As discussed below, it was the duty of the ALJ to weigh this evidence and explain her decision to rely on certain pieces of evidence.

[69]     The ALJ also cited to her discussion under step five of her analysis. However, this discussion simply cites to the same pieces of evidence – *i.e.*, Dr. Bulkin's treatment notes and Dr. Tranese's consultative examination – cited to under step three. R. 71-72.

[70]     The Commissioner also argues that there was no evidence of sensory loss. *Id.* at 3. However, Listing 1.04A only requires the claimant demonstrate "sensory *or* reflex loss," and Smith does not argue that the evidence supports a finding that she experienced sensory loss.

46

August 20, 2009 treatment note finding negative straight leg raising). Dr. Tranese's April 2, 2010 consultative examination also found Smith's straight leg raising test to be negative. R. 279.[71]

As Smith rightly points out, the ALJ's decision relies exclusively on Dr. Bulkin's treatment notes and Dr. Tranese's consultative examination notes, without discussing the significant conflicting evidence presented in Dr. Lifschutz's treatment notes.[72] Smith Reply in Supp. Mot. J. Pleadings 2 ("In its most basic terms, the disagreement can be summarized as follows – Dr. Lifschutz's treating notes contain objective findings demonstrating that each requirement of Listing 1.04A is met, while the records of Dr. Bulkin and the consultative examiner [Dr. Tranese] do not."). That the ALJ has chosen to credit the records of Dr. Bulkin and Dr. Tranese while discounting those of Dr. Lifschutz is troubling. Dr. Lifschutz, like Dr. Bulkin, was one of Smith's treating physicians, and thus the evaluation of his opinions are subject to the "treating physician" rule. Under the treating physician rule, a treating physician's opinion about the nature and severity of a claimant's impairments is entitled to "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic

---

[71]    The Commissioner also argues that "none of the straight leg raising tests were performed in both the sitting and supine positions as the Listing requires." *Id*. at 3. But none of the evidence in the record indicates whether the straight leg raising test was performed in both positions. Dr. Bulkin, Dr. Lifschutz, Dr. Tranese, and Dr. McGibbon (at Arbor WeCare) each indicated only whether the test was negative or positive, without specifying whether the test was performed in the sitting, supine, or both positions.

[72]    The ALJ does cite to Dr. Lifschutz's August 19, 2010 treatment note as evidence to support her determination, but as Smith points out, that treatment note *supports* a finding that Smith met or equaled Listing 1.04 A. Smith Mem. in Supp. Cross-Motion J. Pleadings 8-9. It describes Smith as experiencing neck pain radiating into both shoulders and lower back radiating into the right thigh; a limited range of motion in her cervical and lumbosacral spine; difficulty walking on heels and toes; sluggish ankle jerks; and a positive straight leg raising test at 30 degrees. R. 445. On the basis of these findings, Dr. Lifschutz's treatment note diagnoses Smith with, *inter alia*, right L4-L5 radiculopathy, "L2-L3 central left lateral HNP [herniated nucleus pulposus] deforming the thecal sac and proximal L3 nerve root [,and] L3-L4 and L4-L5 diffuse posterior disc bulges deforming the thecal sac and bilateral L4 and L5 nerve roots." R. 446.

techniques and is not inconsistent with the other substantial evidence in [the] case record."[73]  20

C.F.R. § 404.1527(d)(2); *see also Schisler v. Sullivan*, 3 F.3d 536, 568 (2d Cir. 1993) (upholding

regulations).  Affording a treating physician's opinion controlling weight "reflects the reasoned

judgment" that treating physicians are "most able to provide a detailed, longitudinal picture of

[the claimant's] medical impairment(s) and may bring a unique perspective to the medical

evidence that cannot be obtained from the objective medical findings alone or from reports of

individual examinations, such as consultative examinations or brief hospitalizations."  20 C.F.R.

§ 404.1527(c)(2).  "The factors that must be considered when the treating physician's opinion is

not given controlling weight include '(i) the frequency of examination and the length, nature, and

extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's

consistency with the record as a whole; and (iv) whether the opinion is from a specialist."  *Shaw*

*v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000) (quoting *Clark v. Commissioner of Social Security*,

143 F.3d 15, 118 (2d Cir. 1998)).  The regulations of the Social Security Administration "also

require the ALJ to set forth her reasons for the weight she assigns to the treating physician's

opinion."  *Id.* (citing *Clark*, 143 F.3d at 118.

        Here, the ALJ provided no reasons for discounting the treatment notes of Dr.

Lifschutz while relying on those of Dr. Bulkin.  The absence of such a rationale is particularly

troubling considering that Dr. Lifschutz's treatment notes cover a similar length of time as those

of Dr. Bulkin,[74] Dr. Lifschutz's treatment notes are more recent than those of Dr. Bulkin,[75] and

Dr. Lifschutz's treatment notes are consistent over the span of time that he treated Smith.

---

[73]       The Regulations define "treating source" as a claimant's "own physician, psychologist, or other acceptable medical source who provides [a claimant], or has provided [a claimant] with medical treatment or evaluations and who has, or has had, an ongoing treatment relationship with [a claimant]."  20 C.F.R. § 404.1502.

[74]       The record indicates that Dr. Bulkin treated Smith from August 2009 to February 2010 and Dr. Lifschutz treated Smith from February 2010 to August 2010.

[75]       Smith's first visit with Dr. Lifschutz occurred after she experienced a bus accident in February 2010, which she describes as aggravating certain symptoms, and may explain certain discrepancies in the treatment notes of Dr. Bulkin and Dr. Lifschutz.  R. 469.

Accordingly, I conclude that given the significant conflicting evidence presented by Dr. Lifschutz's treatment notes, I cannot find that there is substantial evidence for the ALJ's determination that Smith failed to meet or equal Listing 1.04A.[76]

CONCLUSION

For the reasons stated above, the Commissioner's motion for judgment on the pleadings is denied and Smith's motion is granted. The case is remanded to the Commissioner for further proceedings consistent with this decision.

So ordered.

John Gleeson, U.S.D.J.

Dated: August 26, 2013
      Brooklyn, New York

---

[76] Because I find that the ALJ erred in her determination that Smith failed to meet or equal Listing 1.04A, I do not address Smith's argument that the ALJ erred in failing to develop the administrative record. Smith Mem. in Supp. Cross-Motion J. Pleadings 11-13.